UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID JONES )<br>    Plaintiff,            )<br>                              )<br>v.                           )<br>                              )<br>JUDYANN BIGBY, JOHN AUERBACH, )<br>LINDA HAN, JULIE NASSIF, and )<br>CHARLES SALEMI        )<br>    Defendants.         )<br>                              ) | C.A. No. 13-11196<br><br>**COMPLAINT AND JURY DEMAND** |

## INTRODUCTION

1. This is a civil rights action in which Plaintiff David Jones seeks relief for Defendants' violations of his rights under the United States Constitution, and the Constitution and laws of the State of Massachusetts.

2. The Plaintiff was wrongfully imprisoned for almost two-and-a-half years, due to the near decade-long fraud perpetrated by a chemist at the William F. Hinton drug lab formerly run by the Department of Public Health (the "JP Drug Lab" or the "Lab"). The fraud of this chemist, Annie Dookhan, was made known, and/or should have been obvious, to her supervisors and managers. Yet those responsible for oversight at the JP Drug Lab allowed this misconduct to continue despite unmistakable warning signs that Dookhan's work was suspect. Moreover, the individuals responsible for development of policies, procedures and protocols at the JP Drug Lab failed to ensure the integrity of the drug testing process and failed to take basic precautions to ensure that the Lab was properly run. These supervisors and managers then illegally suppressed and withheld from the Plaintiff information concerning the misconduct of Dookhan and the systemic failures of the Lab.

1

3. The Defendants in this action have thus violated the Plaintiff's right to be free from wrongful imprisonment and conviction, have denied his right to a fair trial and due process, and have violated his right to disclosure of all exculpatory evidence, in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Articles 12 and 14 of the Massachusetts Declaration of Rights.

4. The Plaintiff seeks compensatory and punitive damages for the violation of his constitutional rights, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION

5. Jurisdiction is conferred upon this Court under 28 U.S.C. §1331, as this action seeks redress for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. §1983.

## PARTIES

6. David Jones is a resident of Boston, MA.

7. JudyAnn Bigby was the Secretary of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts, acting under color of law and within the scope of employment at all times relevant to this complaint.

8. John Auerbach was the Commissioner of the Department of Public Health ("DPH"), acting under color of law and within the scope of employment at all times relevant to this complaint.

9. Julie Nassif was in charge of the Division of Analytical Chemistry within the Department of Public Health, acting under color of law and within the scope of employment at all times relevant to this complaint.

10. Linda Han was the Director of JP Drug Lab, acting under color of law and within the scope of employment at all times relevant to this complaint.

11. Charles Salemi was the supervisor of operations at the JP Drug Lab, acting under color of law and within the scope of employment at all times relevant to this complaint.

## STATEMENT OF FACTS

### Jones' Wrongful Conviction

12. The Plaintiff David Jones was arrested on March 8, 2010, and charged with distribution of a Class B substance, crack cocaine, and distribution within a school zone.

13. The substances seized from the alleged buyer were tested at the JP Drug Lab by chemists Annie Dookhan and Kate Corbett in April.

14. Annie Dookhan was the primary chemist, which, according to the testimony of Kate Corbett at Jones' criminal trial, meant that Dookhan was responsible for logging the drugs in and out of the evidence safe and had custody of the drugs whenever they were outside of the safe.

15. When it was time to test the sample, the primary chemist, Dookhan in this case, was supposed to open the bag, weigh the drugs, and then start the preliminary testing. If the preliminary tests were "positive," she was then supposed to put a small amount of the "positive" sample in the vial and submit it to the confirmatory chemist for further testing.

16. On September 1, 2010, the Plaintiff was convicted on all charges. He was sentenced to 5 years in the House of Correction, 2 ½ years consecutively on each count.

17. The school zone charge was overturned by the Appeals Court in May, 2012, due to lack of evidence.

18. He was later released from custody after more than two years imprisonment, once the Lab misconduct came to light.

19. In March of 2013, his remaining conviction was reversed and the Commonwealth elected not to prosecute him any further.

20. None of the Lab misconduct, discussed in detail below, was disclosed to Jones at any time prior to trial.

### Dookhan Violated Jones' Constitutional Rights

21. Though accurate and reliable chemical analysis is critical to the prosecution of drug offenses and the protection of a defendant's constitutional rights, the egregious misconduct of Dookhan compromised the integrity of the drug testing process and thus the fairness of any subsequent convictions dependent on that analysis.

22. Dookhan has admitted to intentionally contaminating samples; specifically, she would test a sample and, if it turned out not to contain narcotics, she would mix it with a known sample of narcotics so as to falsify a positive result.

23. She likewise admitted to "dry labbing;" specifically, she would "eyeball" a substance to determine what class of drug it was and would then sign a certification that she had, in fact, analyzed the substance chemically.

24. She admitted to forging the signatures of other chemists, specifically Corbett and Dan Renczowski, falsely indicating that they had also analyzed a particular substance chemically.

25. She similarly confessed that she forged the initials of the evidence officer, claiming permission to remove drugs from the safe were none had been given, and forged Quality

Assurance and Quality Control documents, claiming to have calibrated machines when in fact she had not.

26. Finally, she falsified her resume and lied under oath about her credentials; specifically, she claimed to have a master's degree but in fact had never even been admitted to graduate school.

27. On December 17, 2012, Dookhan was indicted in the Suffolk Superior Court on numerous charges, including perjury and evidence tampering. She was subsequently indicted in five other counties for similar offenses.

### The Failures at the Lab Were Systemic and Thus Likely to Produce Constitutional Violations

28. In addition to the misconduct of Dookhan herself, the general practices at the Lab invited error and were likely to result in constitutional violations.

29. Dookhan, and others, had unrestricted access to the laboratory evidence safe, which was found open and unattended when the lab was "busy."

30. The key to the door of the lab also opened the safe; thus many chemists had a key to the safe.

31. Drug samples in pending cases could were pulled from the safe by Dookhan and others without anyone noticing and there was no computerized mechanism to track entry into the evidence room.

32. Further, the evidence officers were not always careful when it came to tracking samples and monitoring access to the evidence room and safe, computer terminals and written logbooks.

33. Dookhan was also allowed to access the evidence office computers to enter and look up data even after she had been suspended from lab duties.

34. Dookhan was in charge of quality control and quality assurance. It was her job to make sure all the balances were working properly and that all the instruments were calibrated according to policies and procedures.

35. After the lab was closed, investigators found drug samples strewn about, including some discovered in desks and filing cabinets and some that were as old as fifteen years.

### The Policies at the Drug Lab Were Deficient, Demonstrating a Deliberate Indifference by the Policymakers to the Constitutional Rights of Jones

36. An Executive Summary, prepared in the aftermath of the JP Drug Lab scandal, identified numerous areas in which the Lab's written policies and procedures were deficient.

37. For example, the Lab's Standard Operating Procedures (SOP's) had not been updated since 2004.

38. The 2004 SOP's did not include comprehensive quality assurance and quality control ("QA/QC") policies and procedures as recommended in the "Scientific Working Group for the Analysis of Seized Drugs" ("SWGDRUG") guidelines.

39. The Lab had no process for routine review and revision of its 2004 SOP's, nor periodic written documentation of compliance.

40. The DPH made no efforts to get the JP Drug Lab accredited by the International Organization for Standardization, which has standards far exceeding the SWGDRUG guidelines.[1]

41. Prior to 2007, a DPH-wide QA/QC unit was staffed by three full-time employees who provided targeted oversight of quality for all of the 18 DPH laboratories. In fiscal year 2008, the Department eliminated the centralized QA/QC function, instead decentralizing

---

[1] By contrast, the State Police Drug Lab in Sudbury is fully accredited.

quality control data reviews to laboratory technical supervisors at the division level. In the JP Drug Lab, these duties fell to the individual chemists.

42. Unlike the traditional public health facilities at the Hinton Lab, there was no outside organizational oversight of QA/QC practices in the JP Drug Lab.

43. As a component of QA/QC, there should be a mechanism that detects unusual or unacceptable occurrences related to quality. One routine method of tracking such events in a laboratory setting is through the use of a discrepancy or adverse events log. A discrepancy in this setting refers to instances in which the results of two (or more) chemists are different.

44. The JP Drug Lab had no such discrepancy or adverse events log.

45. If the confirmatory chemist at the Lab got a different result from the primary, the sample was returned to the primary chemist who was responsible for resolving the cause of the discrepancy. This process is referred to as a "return."

46. Thus, although other chemists saw an increase in the number of "returns" associated with Dookhan beginning in January 2011, the lack of a centralized process for tracking these errors meant that supervisors were ignorant of them.

47. "Returns" are an important indicator of a potential lapse in test quality, but the Drug Lab did not have a written mechanism in place to capture and monitor this data routinely.

48. Moreover, while Control Cards in theory could indicate whether a sample had been retested, these cards often failed to indicate a return.

49. Unlike the Drug Lab, virtually all of the other 17 laboratories within the Hinton Lab building maintained a discrepancy or adverse events log. Maintenance of such a log as well as ongoing tracking of volume of routine concerns or issues should have been a

7

standard practice in the JP Drug Lab. SWGDRUG QA/QC standards require a process to identify and monitor such occurrences.

50. Defendant Bigby has admitted that "the lab maintained outdated operating procedures [and] lacked any type of independent accreditation…"

51. Bigby further admitted that the transfer of the Lab to the auspices of the State Police "was made because the State Police have the oversight, equipment, and procedures that were more consistent with what we know we have to do in the 21st century."

### Supervisors Were Aware of Dookhan's Misconduct as Early as 2008, and Their Inaction Evidences a Deliberate Indifference to the Plaintiff's Constitutional Rights

52. Supervisors at the JP Drug Lab and within DPH were aware, at least as early as 2008, of numerous red flags in Dookhan's work, yet did nothing to determine whether her analyses were accurate.

53. Supervisors were aware that Dookhan often tested up to five times more samples per month than other chemists.

54. Secretary Bigby later described Dookhan's extremely high productivity as, "a red flag that wasn't appropriately investigated."

55. For example, in 2008 or 2009, lab supervisor Peter Piro reported to his supervisors that he was concerned Dookhan was not performing all of the required tests on her samples, due to her extremely high volume. According to Piro, he never saw Dookhan in front of a microscope.

56. He reported his concerns to Charles Salemi.

57. Piro also informed Salemi that Dookhan had forged quality control tests; specifically, she claimed to have performed them when in fact she had not. These tests are crucial for ensuring the accuracy of the confirmatory analysis.

58. Salemi did nothing with this information for over a year.

59. In December 2010, Chemist Michael Lawler became concerned about Dookhan. He reported his concerns about Dookhan's unusually high output to Salemi.

60. Salemi said that his supervisors "had been aware of things" and that he (Salemi) was also uncomfortable with Dookhan, and had concerns regarding her high level of production.

61. Apparently, according to Lawler, Salemi had previously brought his concerns to Julie Nassif.

62. Yet Nassif downplayed the issue, and told Salemi that Dookhan was productive because she "was taking home paperwork, she had high energy, and she was skipping lunches and breaks."

63. To their credit, in 2010, supervisors did an "audit" of Dookhan's work because of her high volume.

64. Incredibly, however, this "audit" did not include any retesting of samples. In fact, at the time the JP Drug Lab was shut down, supervisors never performed retests on any drug samples to ensure they were examined properly.

65. Supervisors were aware that Dookhan's desk was constantly disorganized, with several open samples being tested at once, increasing the risk of cross-contamination.

66. Supervisors either ignored or overlooked the fact that Dookhan circulated several different versions of her resume both within the office and externally, and they never bothered to verify whether she had obtained a masters' degree.

67. Dookhan frequently brought samples to the confirmatory chemist that were misclassified, more so than any other chemist.

68. She, as the primary, would tell the confirmatory that the sample was a particular substance, but the confirmatory would determine it to be something else, thus instigating a process called a "return," in which the sample would then go back to Dookhan to be "fixed."

69. These numerous "returns" should have triggered a more rigorous "audit" than the review of Dookhan's paperwork which was done in 2010.

70. In the spring of 2011, supervisors learned that Dookhan had forged another chemist's signature on an evidence log book, had inappropriately taken samples out of the evidence safe, and then lied about it when asked.

71. This misconduct was not reported to law enforcement or the district attorney for at least six months and, although Dookhan was reassigned from testing duties, she continued to have the run of the lab and continued to appear in court and to testify as a witness in criminal trials.

72. In fact, Dookhan's 2011 misconduct only came to light when Nassif mentioned it offhand to someone who was working on the transfer of the lab from DPH to the Executive Office of Public Safety and Security. Nassif did not divulge the misconduct to her higher-ups sooner because "she felt it was an isolated event" by a "valued employee."

73. Apparently, lab supervisors Nassif and Han believed that the 2011 breach "was simply a result of [Dookhan's] desire to reduce the backlog…There was no question concerning any other motive."

74. Accordingly to the Executive Summary, Han and Nassif failed to report this 2011 breach because they "did not appreciate its potential legal significance."

75. Bigby has admitted that these "lab supervisors failed to properly monitor their direct reports."

76. In December, 2012, Auerbach resigned as Commissioner of the Department of Public Health.

77. Auerbach agreed that "there was insufficient quality monitoring, reporting, and investigating on the part of supervisors and managers surrounding the former Department of Public Health drug lab in Jamaica Plain."

## COUNT I
## VIOLATION OF 42 U.S.C. §1983
## FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS
## BY ALL DEFENDANTS

78. The Plaintiff restates the allegations in paragraphs 1 through 77 and incorporates said paragraphs herein as paragraph 78.

79. By the actions described above, the Defendants have demonstrated a deliberate indifference to the constitutional rights of the Plaintiff. They ignored the fraud perpetrated by Dookhan, developed fatally flawed policies, procedures and protocols for the Lab, failed to ensure the integrity of the drug testing process and failed to take basic precautions to ensure that the Lab was properly run. The Defendants then illegally suppressed and withheld from the Plaintiff exculpatory information concerning the misconduct of Dookhan and the systemic failures of the Lab. Due to the Defendants' failure to disclose this misconduct, the Plaintiff was wrongfully held in jail, convicted and imprisoned.

80. Thus, by the actions described above in paragraphs 1 through 79, the Defendants have violated the Plaintiff's right to be free from wrongful imprisonment, his right to a fair trial, his right to the disclosure of all exculpatory evidence and his right to due process of

law, in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**WHEREFORE,** the Plaintiff requests that this Court award:

1. Compensatory damages against all Defendants jointly and severally;

2. Punitive damages against all individual Defendants;

3. The costs of this action, including reasonable attorneys' fees; and,

4. Such other and further relief, as this Court may deem necessary and appropriate.

### JURY TRIAL DEMAND

A jury trial is hereby demanded for all claims.

                    Respectfully submitted,
                    Plaintiff David Jones
                    By His Attorneys

DATED: May 15, 2013        /s/ Michael Tumposky
                    Michael Tumposky (BBO No. 660618)
                    Jessica D. Hedges (BBO No. 645847)
                    Hedges & Tumposky, LLP
                    15 Broad Street, Suite 240
                    Boston, MA 02109
                    T) (617) 722-8220
                    F) (617) 507-8116
                    E) tumposky@htlawyers.com