UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. |
| v. | ) | 13-11196-FDS |
| | ) | |
| LINDA HAN, JULIE NASSIF, and | ) | |
| CHARLES SALEMI, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, J.**

This is a suit under 42 U.S.C. § 1983 arising out of the falsification of drug tests at the William F. Hinton Drug Laboratory in Jamaica Plain, Massachusetts, by chemist Annie Dookhan.

In 2010, plaintiff David Jones was convicted of distribution of crack cocaine and sentenced to a term of imprisonment of five years. His conviction was based in part on drug-analysis evidence produced by Dookhan at the Hinton Laboratory. He was released from custody, after more than two years of imprisonment, when it was discovered that Dookhan had been fraudulently producing false drug-analysis reports.

Jones contends that Dookhan's supervisors at the laboratory violated his constitutional rights by failing to disclose her fraud during his criminal prosecution. Defendant Linda Han was the director of the Hinton Laboratory during the relevant time. She has moved to dismiss the

claims against her, contending she did not know of Dookhan's conduct, did not have a legal obligation to correct it, and did not act with deliberate indifference as to her conduct. Han further contends that she is entitled to qualified immunity as to plaintiff's claims. Defendant Julie Nassif was Han's supervisor and in charge of the Division of Analytical Chemistry within the Department of Health during plaintiff's arrest, conviction, and imprisonment. She has likewise moved to dismiss on the ground of qualified immunity.

For the following reasons, defendants' motions will be denied.

### I.   Background

#### A.   Factual Background

The facts are set forth below as alleged in the complaint.

##### 1.   The Hinton Laboratory

The William F. Hinton Drug Laboratory in Jamaica Plain, Massachusetts, was operated by the Department of Health and Human Services for the Commonwealth of Massachusetts. Julie Nassif was in charge of the Division of Analytical Chemistry within the Department of Public Health. Linda Han was the Director of the laboratory. Charles Salemi was the Supervisor of Operations at the laboratory.

##### 2.   Plaintiff's Criminal Prosecution

David Jones was arrested on March 8, 2010, on charges of distribution of a Class B substance (crack cocaine) and distribution within a school zone. The substances seized from him were tested at the Hinton Laboratory in April 2010 by chemists Annie Dookhan and Kate Corbett. Dookhan was the primary chemist; she was responsible for logging the alleged drugs in and out of the evidence safe and had custody of the drugs whenever they were outside the safe.

It was also her responsibility to perform the preliminary testing to see if the alleged drugs were actually crack cocaine.

Dookhan testified at Jones's trial. She opined that the substance was crack cocaine. On September 2, 2010, Jones was convicted on both charges. He was sentenced to five years in prison.[1]

After information about Dookhan's misconduct came to light, Jones was released from custody. In March 2013, his conviction was reversed and the Commonwealth declined to prosecute him further.

No information concerning possible misconduct at the Hinton Laboratory, or deficiencies in the laboratory's policies or procedures, was disclosed to Jones during the prosecution of his case.

### 3. Dookhan's Misconduct

Dookhan has admitted to various types of misconduct concerning the drug analyses she performed at the Hinton Laboratory. First, she has admitted that she falsified positive results by intentionally contaminating samples with narcotics if initial tests showed they were not narcotics. Second, she has admitted to so-called "dry labbing," or determining what drug a substance was by looking at it rather than analyzing the substance chemically. Third, she has admitted to forging the signatures of two other chemists, Kate Corbett and Dan Renczowski, thereby falsely indicating that they had chemically analyzed a particular substance. Fourth, she has admitted to forging the initials of the evidence officer to remove samples from the lab's safe without authority. Fifth, she has admitted to forging quality-assurance and quality-control

---

[1] The conviction for distribution within a school zone was overturned in May 2012 by the Massachusetts Appeals Court.

documents, falsely claiming that she calibrated drug-analysis machines in the laboratory. Finally, she has admitted that she falsely claimed that she had a master's degree, both on her resume and while testifying under oath.

Dookhan was indicted in Suffolk Superior Court on December 17, 2012, on various charges, including perjury and evidence tampering. She was subsequently indicted in five other counties for similar offenses. On November 22, 2013, she pleaded guilty to 27 of those criminal charges, and was sentenced to a term of three to five years in prison.

### 4. Quality Control Procedures at the Hinton Laboratory

Plaintiff alleges that the practices, procedures, and policies at the Hinton Laboratory were deficient in assuring proper drug analysis. He asserts two principal contentions.

First, he contends that Dookhan and other chemists had unrestricted access to the laboratory's evidence safe, which was open and unattended when the laboratory was busy. There was no computerized mechanism for tracking entry into the evidence room, and evidence officers were not always careful when it came to tracking samples and monitoring access to that room. Dookhan was allowed to obtain access to the evidence computers to enter and look up data even after she had been suspended from her laboratory duties. After the laboratory was closed, investigators found drug samples strewn about, including some that were discovered in desks and filing cabinets and some that were 15 years old.

Second, plaintiff contends that the laboratory had insufficient quality-assurance and quality-control policies and procedures. The laboratory's standard operating procedures had not been updated since 2004, and did not meet quality-control standards recommended by the Scientific Working Group for the Analysis of Seized Drugs. In addition, the laboratory was not

4

accredited by the International Organization for Standardization, which has promulgated standards exceeding the working group's guidelines.

In fiscal year 2008, quality-control reviews at the Hinton Laboratory were conducted by the individual chemists. No outside organization oversaw quality control at the laboratory. The laboratory also failed to employ mechanisms in order to detect unusual or unacceptable occurrences relating to quality, such as logs for discrepancies or adverse events. Accepted laboratory standards require such logs or an equivalent process to identify and monitor quality; according to plaintiff, all seventeen other laboratories within the same building maintained such logs.

Although the laboratory did have a confirmatory chemist check the work of the primary chemist who first tested a sample, when a different result was obtained, that chemist simply returned the sample to the primary chemist. There was no centralized process for tracking the number of returns to each chemist. Dookhan herself was the chemist in charge of quality control at the Hinton Laboratory. Her responsibilities included calibrating the instruments and making sure the balances were working properly.

### 5.     Alleged Failures by Laboratory Supervisors

Plaintiff contends that Dookhan's supervisors at the laboratory failed to investigate several "red flags" concerning her work beginning in 2008. (Compl. ¶ 54). Dookhan often tested five times as many samples per month as other chemists. In 2008 or 2009, laboratory supervisor Peter Piro reported to Charles Salemi that he was concerned that Dookhan was not performing all the required tests on her samples. He also informed Salemi that he believed Dookhan had forged quality-control tests. In December 2010, chemist Michael Lawler likewise

reported to Salemi his concerns about Dookhan's unusually high output of drug analyses. Salemi said his supervisors "had been aware of things," and that he himself was uncomfortable with Dookhan and her purportedly high level of production. (Compl. ¶ 60).

In 2010, Dookhan's supervisors performed an audit of her work because of the high volume of drug tests she had been conducting. That audit, however, did not include re-testing of samples to ensure the drugs were tested properly, and was essentially a review of her paperwork.

Plaintiff further contends that supervisors were also aware that Dookhan's desk was constantly disorganized, with several open samples being tested at once, thus increasing the risk of cross-contamination. He contends that they ignored or overlooked the fact that she circulated several different versions of her resume, and did not verify whether she had obtained a master's degree. He also contends that Dookhan had a high proportion of samples returned to her because they were improperly classified as narcotics.

In the spring of 2011, supervisors learned that Dookhan had forged another chemist's signature on an evidence log book, had inappropriately taken samples out of the evidence safe, and had lied about it when asked. Dookhan was reassigned from testing duties. However, she continued to have full access to the laboratory and to appear in court to testify as a witness in criminal trials. The misconduct was not reported to law enforcement officials for at least six months. According to the complaint, Linda Han and Julie Nassif believed that the 2011 breach "was simply a result of [Dookhan's] desire to reduce the backlog . . . There was no question concerning any other motive." (Compl. ¶ 73). They failed to report the breach because they "did not appreciate its potential legal significance." (Compl. ¶ 74).

B.  **Procedural Background**

Plaintiff filed this case on May 15, 2013, asserting claims under 42 U.S.C. § 1983 for various civil rights violations. The initial complaint listed JudyAnn Bigby, John Auerbach, Julie Nassif, Linda Han, and Charles Salemi as defendants. Plaintiff voluntarily dismissed his claims against Bigby and Auerbach on September 25, 2013.

The complaint alleges that defendants ignored Dookhan's fraud, developed flawed laboratory policies, and failed to ensure the integrity of the drug testing process. It also contends that defendants illegally withheld exculpatory information from plaintiff in his criminal prosecution about Dookhan's misconduct and the systemic failures of the laboratory.

Han has moved to dismiss, contending that (1) the complaint fails to allege sufficient facts for supervisory liability under 42 U.S.C. § 1983 and (2) she is entitled to qualified immunity. Nassif has also moved to dismiss, also claiming qualified immunity.

II.  **Standard of Review**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

### III. Personal Liability Under § 1983

Section 1983 "creates a private right of action for redressing abridgements or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.2d 29, 33 (1st Cir. 1995). "A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008).

#### A. Defendants' Personal Liability

Plaintiff contends that defendants are personally liable for violating his constitutional rights because they failed to disclose impeachment information in the course of his criminal prosecution. In a criminal case, the government has the burden of disclosing evidence "favorable to the accused." *Brady v. Maryland*, 373 U.S. 83, 86 (1963). "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). The prosecution violates the rule of *Brady* when it "suppresses 'material' evidence that is favorable to the accused." *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir. 1995). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

No case in the First Circuit has specifically addressed the government's *Brady*

obligations with respect to impeachment evidence concerning a state-employed witness such as Dookhan.  *United States v. Wilkins*, 2013 WL 1988614, at *4 n.9 (D. Mass. 2013) (citing *Junta v. Thompson*, 615 F.3d 67, 74 n.5 (1st Cir. 2010)).  However, the Massachusetts Supreme Judicial Court has found that "[a] prosecutor's obligations extend to information in possession of a person who has participated in the investigation or evaluation of the case and has reported to the prosecutor's office concerning the case."  *Commonwealth v. Martin*, 427 Mass. 816, 824 (1998).  The SJC concluded that a prosecutor must turn over evidence "held by the State police crime laboratory and perhaps known only to one of its chemists" to fulfill its *Brady* obligations. *Id.* at 823.

Beyond question, any exculpatory or impeachment information concerning Dookhan should have been turned over to defense counsel in the prosecution of plaintiff.  The complaint alleges that defendants had knowledge of Dookhan's inordinately high number of tests and the poor-quality control measures in place at the laboratory.  That information was material because plaintiff's conviction for distribution of crack cocaine obviously hinged on proof that the alleged substance was in fact crack cocaine.  If Dookhan's credibility as a chemist were seriously challenged, the jury could have had a reasonable doubt as to that element.  *Cf. United States v. Ferreras*, 192 F.3d 5, 11 (1st Cir. 1999) (proper chemical analysis can prove that contraband is cocaine).  The failure to turn that information over to plaintiff during his criminal prosecution was a *Brady* violation.

No case has directly discussed whether a state laboratory official can be held liable under § 1983 for violations of *Brady*.  Generally, the Supreme Court has defined the *Brady* duty as one that rests with the prosecution.  *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (collecting

9

cases). However, "law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009)); *see also Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("[A] police officer sometimes may be liable [under § 1983] if he fails to appraise the prosecutor or a judicial officer of known exculpatory information.") (collecting cases). Because "the police are just as much an arm of the state as the prosecutor, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *Moldowan*, 578 F.3d at 379.

State drug analysts are as much an arm of the government as are police officers, and can also inflict constitutional injury if they fail to disclose material exculpatory or impeachment information to the prosecution. Therefore, it seems clear that defendants can be found liable for failing to provide exculpatory or impeachment information to the prosecutor for disclosure to the defendant.

The alleged exculpatory or impeachment evidence in this case concerns the reliability of the testing performed by Dookhan. Dookhan testified at plaintiff's trial. Plaintiff alleges that Dookhan's supervisors, including defendants, knew that she often tested up to five times more samples per month than other chemists; that they were aware of complaints about Dookhan from Peter Piro and Michael Lawler;[2] and that they ignored the fact that Dookhan circulated several different versions of her resume within the office. None of that information was disclosed to

---

[2] Although the complaint does not specifically allege that defendants were told of these complaints, it does allege that Salemi said his supervisors "had been aware of things." On a motion to dismiss, all reasonable inferences are drawn in favor of the plaintiff. *See Jordan v. Carter*, 428 F.3d 67, 74 (1st Cir. 2005). Because defendants are Salemi's supervisors, the Court infers that Salemi's statement refers to defendants.

plaintiff during his criminal prosecution.[3]

Assuming the facts alleged in the complaint are true, defendants knew about material impeachment evidence concerning Dookhan and failed to disclose it to the prosecutor in plaintiff's case. The complaint therefore states a claim under § 1983.

### B. Qualified Immunity for Personal § 1983 Violations

Defendants nonetheless contend that the complaint should be dismissed because they are entitled to qualified immunity.[4] The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified-immunity analysis employs a two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). For purposes of the second step of that analysis, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that was he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right." *Mlodzinski v.*

---

[3] "[I]mpeachment information is special in relation to the *fairness of a trial . . . .*" *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis in original). Therefore, the Court will only consider the suppression of material evidence at trial for the purposes of this claim and will not consider evidence of misconduct discovered after plaintiff's conviction.

[4] Because questions of qualified immunity should be resolved at the earliest possible stage, courts can address them on a motion to dismiss. *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (citing *Hunter v. Bryan*, 502 U.S. 224, 227 (1991) (*per curiam*)).

*Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011).

The qualified-immunity doctrine "leaves ample room for mistaken judgments." *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The question is not whether some right has been clearly established at a highly abstract level, but "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir. 1991). Thus, officials may enjoy qualified immunity even though their conduct actually abridged a constitutional right. *Berthiaume*, 142 F.3d at 15.

The complaint here alleges that defendants knew that Dookhan performed five times as many tests as other chemists, that they had received complaints that she forged quality-control tests, and that they ignored the fact that she circulated different copies of her resume. An objectively reasonable crime-laboratory supervisor would have understood that such information should be reported to prosecutors, because fabricated or unreliable drug-analysis results would affect the outcomes and, indeed, the basic fairness, of the affected criminal cases. At the very least, an objectively reasonable laboratory supervisor would have done something to investigate the alleged irregularities to see if there was a problem to disclose. As alleged by plaintiff, the 2010 audit of Dookhan's work was insufficient to address those issues because, among other things, it did not include re-testing of samples.

As noted, no case law directly on point has imposed civil liability on state laboratory officials for *Brady* violations. However, "[i]t follows logically that, in some situations, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity

to the specific conduct in question.'" *Limone v. Condon*, 372 F.3d 39, 48 (1st Cir. 2004) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). It was well-established that a police officer could be held liable for not disclosing exculpatory information. It would have been obvious that the same principle would extend to state drug-laboratory chemists and supervisors. Accordingly, defendants were on reasonable notice that the information they knew about Dookhan should have been disclosed. *See Drumgold*, 707 F.3d at 43 (affirmative disclosure obligation *Brady* imposed on prosecutors was expanded to include law enforcement officers in 1995 by *Kyles*); *Martin*, 427 Mass. at 824 (*Brady* obligation extends to state laboratory chemist reports).

Defendants are therefore not entitled to qualified immunity at this stage of the proceedings. In the context of a motion to dismiss, the Court must accept the plausible factual allegations in the complaint as true. *Twombley*, 550 U.S. at 555-56. The complaint alleges that defendants knew about serious concerns over the accuracy of Dookhan's chemical testing and did not disclose that information to prosecutors in his case. That is sufficient to defeat a claim of qualified immunity at the pleadings stage.

**IV.** **<u>Supervisory Liability Under § 1983</u>**

Plaintiff also contends that defendants are responsible as supervisors for Dookhan's constitutional violations. However, *respondeat superior* cannot serve as the basis for supervisor liability in an action under § 1983. *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996). For supervisory liability to attach, the plaintiff must show an affirmative link between the constitutional violation and the supervisor's actions and omissions, "whether through direct participation or through conduct that amounts to condonation or tacit authorization." *Camilo-

*Robles v. Zapata*, 175 F.3d 41, 43 (1st Cir. 1999).

> Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.

*Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (internal citations and quotations omitted).

### A. Defendants' Supervisory Liability

#### 1. Dookhan's Unconstitutional Conduct

The parties do not contest that the complaint properly alleges constitutional violations by defendant's subordinate, Dookhan. As the First Circuit has recognized:

> . . . if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. *See, e.g., Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir.2001) (*en banc*). Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).

*Limone v. Condon*, 372 F.3d at 44-45. *See also Whitlock v. Brueggemann*, 682 F.3d 567, 585-86 (7th Cir. 2012) (collecting cases). "A false or scientifically inaccurate report is equivalent to any other false evidence created by investigators, such as a false police report." *Brown v. Miller*, 517 F.3d 231, 237 (5th Cir. 2008).

#### 2. Deliberate Indifference

For supervisory liability to attach, the complaint must also plausibly allege that defendants' action or inaction was affirmatively linked to Dookhan's constitutional violations. "The requirement of an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the

constitutional violation.'" *Pineda*, 533 F.3d at 54 (quoting *Hegarty v. Somerset County*, 53 F.3d 1367, 1380 (1st Cir. 1995)). This means that the supervisor's behavior must amount to "supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." *Id.* A finding of deliberate indifference requires a showing that "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Id.* (quoting *Hegarty*, 53 F.3d at 1380). Such indifference by a supervisor can be shown if the supervisor had actual knowledge of or was willfully blind to the alleged constitutional violations. *See Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 535 (1st Cir. 2011); *Camilo-Robles*, 151 F.3d at 6-7. Isolated instances of unconstitutional activity are ordinarily insufficient to show deliberate indifference. *Maldonado-Denis v. Castillo Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

   Defendant Han, however, contends that plaintiff must prove she had a "subjective belief" that there was a risk unconstitutional harm to have been deliberately indifferent, citing *Snell v. Demello*, 44 F. Supp. 2d 386 (D. Mass. 1999). *Snell* is easily distinguishable. In *Snell*, the plaintiff sued prison officials for violations of the Eighth and Fourteenth Amendments. *Id.* at 388. The "subjective belief" standard from *Snell* originated in the Supreme Court's Eighth Amendment analysis in *Farmer v. Brennan*, 511 U.S. 825 (1994). The *Farmer* court reasoned that because the Eighth Amendment outlawed cruel and unusual "punishments" and not cruel and unusual "conditions," "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. The court therefore adopted a subjective approach because it "isolates those who inflict punishment" as required by the Eighth Amendment. *Id.* at

15

839.

Outside the Eighth Amendment context, however, an official can be deliberately indifferent to constitutional violations by her subordinates without holding a subjective belief that their actions would result in constitutional harms.  *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 564-65 (1st Cir. 1989) (affirming liability of superintendent of police department even though he did not believe the volume and frequency of complaints against police officer evidenced a pattern of improper behavior); *Febus-Rodriguez v. Bentancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994) (proper supervisory liability attaches if plaintiffs could show that official "should have known that there were recruitment and training problems, and that he was indifferent to such problems").  Here, the allegations of the complaint are sufficient to state a claim for acquiescence or "gross negligence amounting to deliberate indifference" to those violations by defendant.  *Pineda*, 533 F.3d at 54.  It therefore properly states a supervisor liability claim under § 1983.

### B. Qualified Immunity for Supervisory § 1983 Violations

Defendants contends they are entitled to qualified immunity as to plaintiff's claims for supervisory liability under § 1983.  "When a supervisor seeks qualified immunity in a § 1983 action, the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context."  *Camilo-Robles*, 151 F.3d at 6.

Again, although there is no direct authority for holding state crime laboratory supervisors liable for their deliberate indifference to constitutional violations by their subordinates, the

constitutional rights and supervisory liability doctrine that underlie plaintiff's claims are clearly established. *See Limone*, 372 F.3d at 44-45 (convictions based on fabricated evidence violate due process); *Pineda*, 533 F.3d at 54 (outlining supervisory liability on § 1983 claims). The qualified immunity analysis here therefore turns on whether, in the particular circumstances confronted by defendants, they should have reasonably understood that their conduct jeopardized the constitutional rights of criminal defendants subject to the laboratory testing procedures. *See Camilo-Robles*, 151 F.3d at 7.

Reasonable officials in defendants' position, as alleged in the complaint, would have known their conduct could violate a criminal defendant's rights to due process and a fair trial. Assuming the allegations in the complaint are true, defendants were "put on notice of behavior which was likely to result in the violation of the constitutional rights of citizens." *Febus-Rodriguez*, 13 F.3d at 93. Whether plaintiff can prove those claims is a question for another day.

**V.     Conclusion**

For the foregoing reasons, defendants' motions to dismiss are DENIED.

**So Ordered.**

    /s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: January 28, 2014    United States District Judge