UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID JONES )
    Plaintiff, )
                                      )    C.A. No. 13-11196-LTS
                                        )
v. )
                                        )
LINDA HAN, JULIE NASSIF, and )
CHARLES SALEMI )
    Defendants. )
                                        )

**PLAINTIFF'S L.R. 56.1 STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, David Jones, pursuant to L.R. 56.1, and hereby submits the following statement of disputed material facts in opposition to the Defendants' Motion for Summary Judgment.

## STATEMENT OF DISPUTED MATERIAL FACTS

### Jones' Wrongful Conviction

1. The Plaintiff David Jones was arrested on March 8, 2010, and charged with distribution of a Class B substance, crack cocaine, and distribution within a school zone. Criminal Docket, 9120.[1]

2. The substances seized from the alleged buyer were tested at the JP Drug Lab by chemists Annie Dookhan and Kate Corbett in April of that year. Jones Drug Certification, 9148.

3. Dookhan was the primary chemist, which means that she was responsible for logging the drugs in and out of the evidence safe and had custody of the drugs whenever they were outside of the safe. Trial Transcript, 9248.

---

[1] For ease of reference, most documents will be referred to by their title and a Bates Stamp number, located at the bottom of the page.

1

4. When it was time to test the sample, Dookhan was supposed to open the bag, weigh the drugs, and then start the preliminary testing. If the preliminary tests were "positive," she was then supposed to put a small amount of the "positive" sample in the vial and submit it to the confirmatory chemist for further testing. Trial Transcript, 9248.

5. At trial, the prosecutor asked the testifying chemist Corbett whether she had ever run a confirmatory test on a substance that had been preliminarily identified as cocaine and found that the preliminary test was inaccurate. She answered "no." Trial Transcript, 9254-55.

6. On September 1, 2010, the jury convicted the Plaintiff on all charges. Criminal Docket, 9120.

7. He was sentenced to 5 years in the House of Correction, 2 ½ years consecutively on each count. Criminal Docket, 9121.

8. The school zone charge was overturned by the Massachusetts Appeals Court in May, 2012, due to lack of evidence. Criminal Docket, 9121.

9. He was released from custody later that year after more than two years imprisonment, once the Lab misconduct came to light. Affidavit of Jones, ¶2.

10. In March of 2013, his remaining conviction was reversed and the Commonwealth elected not to prosecute him any further. Docket, 9129

11. None of the Lab misconduct, discussed in detail below, was disclosed to Jones at any time prior to trial. Affidavit of Jones, ¶3.

**The Lab's Hierarchy**

12. JudyAnn Bigby was the Secretary of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts. Jones Drug Certification, 9148

13. John Auerbach was the Commissioner of the Department of Public Health ("DPH"), who reported to Bigby. Jones Drug Certification, 9148

14. Linda Han was the Director of entire State Lab System, and reported to Auerbach. Han Interview, 7530.

15. Julie Nassif was the Director of Analytical Chemistry, and she reported to Han. Han Interview, 7530.

16. Nassif supervised Charles Salemi, who himself was the supervisor of operations at the JP Drug Lab. Salemi supervised Dookhan and the other line chemists. Drug Lab Organizational Chart.

**Dookhan Violated Jones' Constitutional Rights**

17. Dookhan has admitted to intentionally contaminating samples; specifically, she would test a sample and, if it turned out not to contain narcotics, she would mix it with a known sample of narcotics in order to falsify a positive result. Dookhan Interview, 6860, 6864.

18. She likewise admitted to "dry labbing;" specifically, she would "eyeball" a substance to determine what class of drug it was and would then sign a certification that she had, in fact, analyzed the substance chemically. Dookhan Interview, 6864.

19. She admitted to forging the signatures of other chemists, specifically Corbett and Dan Renczowski, falsely indicating that they had also analyzed a particular substance chemically. Renczowski Interview, 6792. This forgery was reported to Salemi. Renczowski Interview, 6793, Corbett Interview, 6832

20. Dookhan similarly confessed that she forged the initials of the evidence officer, claiming permission to remove drugs from the safe were none had been given, and forged Quality Assurance and Quality Control documents, claiming to have calibrated machines when in fact she had not. Dookhan Interview, 6858-59.

3

21. Finally, she falsified her resume and lied under oath about her credentials; specifically, she claimed to have a master's degree but in fact had never even been admitted to graduate school. O'Brien Interview, 6817.

22. On December 17, 2012, Dookhan was indicted in the Suffolk Superior Court on numerous charges, including perjury and evidence tampering. She was subsequently indicted in five other counties for similar offenses. She later pled guilty and was sentenced to 3-5 years in state prison.[2]

### The Defendants Were Aware of Dookhan's Misconduct as Early as 2008 and Failed to Disclose it or Take Other Remedial Action

23. The Defendants were aware that Dookhan tested far more samples per month than other chemists. Han Interview, 7530.

24. Secretary Bigby later described Dookhan's extremely high productivity as "a red flag that wasn't appropriately investigated."[3]

25. In 2007 or 2008, lab supervisor Peter Piro noticed that Dookhan's numbers were high. In 2009, he reported to Defendant Salemi that he was concerned Dookhan was not performing all of the required tests on her samples, due to her extremely high volume. According to Piro, he never saw Dookhan in front of a microscope. Piro Interview, 6808.

26. Piro also informed Salemi that Dookhan had forged quality control tests; specifically, she claimed to have performed them when in fact she had not. These tests are crucial for ensuring the accuracy of the confirmatory analysis. Piro Interview, 6809.

---

[2] "Annie Dookhan pleads guilty in drug lab scandal", <https://www.bostonglobe.com/metro/2013/11/22/annie-dookhan-former-state-chemist-who-mishandled-drug-evidence-agrees-plead-guilty/7UU3hfZUof4DFJGoNUfXGO/story.html>, November 22, 2013

[3] "Since '03, Dookhan output unusually high", <http://commonwealthmagazine.org/criminal-justice/022-dookhans-work-output-unusually-high-since-2003/>, Nov. 28, 2012

4

27. Piro also informed Salemi that Dookhan was frequently mistaking heroin for cocaine, suggestive of dry-labbing. Piro Interview, 6810.

28. Salemi emailed Nassif about this complaint, according to Piro. Piro Interview, 6809.

29. In December 2010, Chemist Michael Lawler became concerned about Dookhan. He reported his concerns about Dookhan's unusually high output to Salemi. Lawler Interview, 6806.

30. Salemi said that his supervisors (i.e. Nassif and Han) "had been aware of things" and that he (Salemi) was also uncomfortable with Dookhan, and had concerns regarding her high level of production. Lawler Interview, 6806.

31. According to Lawler, Salemi had previously brought his concerns about Dookhan to Julie Nassif. Yet Nassif downplayed the issue, and told Salemi that Dookhan was productive because she "was taking home paperwork, she had high energy, and she was skipping lunches and breaks." Lawler Interview, 6806.

32. In early 2010, supervisors did do an "audit" of Dookhan's work because of her high volume. Incredibly, however, this "audit" did not include any retesting of samples. In fact, at the time the JP Drug Lab was shut down, supervisors never performed retests on any drug samples to ensure they were examined properly. Salemi Interview, 6801.

33. The Defendants likewise ignored the fact that Dookhan had circulated several different versions of her resume both within the office and externally, and never bothered to verify whether Dookhan had obtained a masters' degree, as she falsely claimed. O'Brien Interview, 6817.

34. When Nassif was told again in 2011 about Dookhan's abnormally high productivity, and that she had forged several chemists' signatures, she "decided she would give Dookhan a special project to try and slow her down." Salemi Interview, 6801, 6802.

35. Salemi asked that Dookhan be assigned a dedicated supervisor, but Han and Nassif refused. Salemi Interview, 6802.

**The Lab Scandal Begins to Come to Light**

36. In June of 2011, supervisors Han and Nassif learned that Dookhan had forged another chemist's signature on an evidence log book, had inappropriately taken samples out of the evidence safe, and then lied about it when asked ("the June breach"). This misconduct was not reported to law enforcement, defense counsel or the district attorney for at least six months. Chilian Report, 7653-56.

37. In fact, Dookhan continued to test samples, have the run of the lab, and appeared in court and to testify as a witness in criminal trials, which the Defendants knew. Corbett Interview, 6833; Executive Summary 7696; Inspector General's Report, page 76-78.

38. Dookhan's "punishment" for the June breach was an assignment to update the Lab's outdated policies, which she had admittedly violated just days before. Inspector General's Report, page 69; Han Interview, 7531.

39. In fact, Dookhan's June 2011 misconduct only came to light in December of that year when Nassif mentioned it offhand to someone who was working on the transfer of the lab from DPH to the Executive Office of Public Safety and Security. Nassif Interview, 8013.

40. Nassif did not divulge the misconduct to her higher-ups sooner because "she felt it was an isolated event" by a "valued employee." Executive Summary, 7741.

41. Apparently, lab supervisors Nassif and Han believed that the June 2011 breach "was simply a result of [Dookhan's] desire to reduce the backlog…There was no question concerning any other motive." Executive Summary, 7695. Despite Salemi's request that Dookhan be banned from testing at this time, Nassif refused. Salemi Interview, 6802.

42. Han and Nassif failed to report this June 2011 breach because they did not appreciate "its potential legal significance." Chilian Report, 7655.

43. When an investigative report of this June 2011 breach was completed, Han and Nassif did not read it so "they could not be called to court to testify about it." Nassif Interview, 8013.

44. Nassif warned another chemist, Gloria Phillips, "not to tell anyone about the June breach." Inspector General's Report, page 68.

45. During the Inspector General's Audit of the Lab, it was discovered that the June, 2011 breach was not the only time Dookhan had similarly violated chain of custody protocol and then committed fraud to cover her tracks.

46. In fact, she did the same thing one month earlier, in May of 2011 ("the May breach"). Inspector General's Report, page 75; Notes Regarding May Breach, 7666 to 7669.

47. Even after both the May and June breaches, Han hoped that Dookhan would "admit her mistake" and then return to testing. Draft Han Interview Report, 7768.

48. The Defendants were aware of the May breach but failed to report it to any external body even as they began to deal with the fallout from the June breach and even as the entirety of the Lab's misconduct began to come to light in 2012. Inspector General's Report, pages 75, 76, 85.

49. In February, 2012, Han wrote a letter to the Norfolk District Attorney. That letter mentioned the June breach, but failed to mention the May breach. It also included the following language:

> Prior to this incident, [Ms. Dookhan] had no personnel issues and was well respected for the accuracy of her work and her dedication to the Laboratory's mission. In review of the incident, the managers at the Laboratory did not believe there was any reason to believe that the integrity of the samples had been affected by the breach in protocol or the late entries in the log book. However, the chemist was removed from all responsibilities involving laboratory analysis as of June 21, 2011...The Central Office conducted its own

7

investigation of the incident and confirmed that there was no evidence to suggest that the integrity of the results was impacted.

Han Letter, 8062-64.

50. The Inspector General later determined that every sentence quoted above was untrue.

Inspector General's Report, pages 72-73.

## The Failures at the Lab Were Systemic and Thus Likely to Produce Constitutional Violations

51. In addition to tacit acquiescence in the misconduct of Dookhan herself, the Defendants tolerated general practices at the Lab which allowed for, and even encouraged constitutional violations.

52. Dookhan, and others, had unrestricted access to the laboratory evidence safe, which was found open and unattended when the lab was "busy." Renczowski Interview, 6795, O'Brien Interview, 6815; Hevis Interview, 6819.

53. The key to the door of the lab also opened the safe; thus many chemists had a key to the safe, including Dookhan. O'Brien Interview, 6815.

54. Dookhan was also allowed to access the evidence office computers to enter and look up data even after she had been suspended from lab duties. Glazer Interview, 6821-22; Medina Interview, 6827.

55. Despite the numerous red flags, and despite never having her credentials verified, Dookhan, of all people, was in charge of quality control and quality assurance. It was her job to make sure all the balances were working properly and that all the instruments were calibrated according to policies and procedures, yet she frequently failed to run these calibrations. Commonwealth v. Blue Exerpt, 5585.

8

56. After the lab was closed, investigators found drug samples strewn about, including some discovered in desks and filing cabinets and some that were as old as fifteen years.[4]

**The Defendants Were Aware That the Lab Had Deficient Policies and Procedures, Thus Creating a Substantial Risk of Constitutional Violations**

57. The Lab's Standard Operating Procedures (SOP's) had not been updated since 2004. Han Interview, 7530, 7533

58. The 2004 SOP's did not include comprehensive quality assurance and quality control ("QA/QC") policies and procedures as recommended in the "Scientific Working Group for the Analysis of Seized Drugs" ("SWGDRUG") guidelines. Executive Summary, 7689.

59. The Lab had no process for routine review and revision of its 2004 SOP's, nor periodic written documentation of compliance. Executive Summary, 7690.

60. Neither Han nor Nassif made no efforts to get the JP Drug Lab accredited by the International Organization for Standardization, which has standards far exceeding the SWGDRUG guidelines. Han Interview, 7530.

61. A discrepancy or adverse events log is one in which instances where the results of two (or more) chemists are different. Executive Summary, 7698. Han and Nassif did not require that the JP Drug Lab have such a discrepancy or adverse events log. Executive Summary, 7655

62. If the confirmatory chemist at the Lab got a different result from the primary, the sample was returned to the primary chemist who was responsible for resolving the cause of the discrepancy. This process is referred to as a "return." Executive Summary, 7698.

63. Thus, although other chemists saw an increase in the number of "returns" associated with Dookhan beginning in January 2011, the lack of a centralized process for tracking these

---

[4] "Photos Reveal Sloppy Condition at Now Closed Lab", < http://www.wbur.org/2013/04/02/drug-lab-photos-conditions>, April 2, 2013.

errors meant that supervisors were able to ignore them. "Returns" are an important indicator of a potential lapse in test quality, but the Defendants did not employ a mechanism to capture and monitor this data routinely. Executive Summary, 7698.

64. Unlike the Drug Lab, virtually all of the other seventeen laboratories within the Hinton Lab building maintained a discrepancy or adverse events log. Maintenance of such a log as well as ongoing tracking of volume of routine concerns or issues should have been a standard practice in the JP Drug Lab. SWGDRUG[5] QA/QC standards require a process to identify and monitor such occurrences. Executive Summary, 7698.

65. Dookhan, for example, frequently brought samples to the confirmatory chemist that were misclassified, more so than any other chemist, yet there was no mechanism to record these errors. Executive Summary, 7698.

66. She, as the primary, would tell the confirmatory that the sample was a particular substance, but the confirmatory would determine it to be something else, thus instigating a "return," in which the sample would then go back to Dookhan to be "fixed." Executive Summary, 7698.

67. Secretary Bigby has admitted that "the lab maintained outdated operating procedures [and] lacked any type of independent accreditation…"[6]

68. Bigby further admitted that the transfer of the Lab to the auspices of the State Police "was made because the State Police have the oversight, equipment, and procedures that were more consistent with what we know we have to do in the 21st century."[7]

---

[5] Despite significant departures from SWDRUG standards, Nassif wrote a letter that was cited by both parties before the Supreme Court in the Melendez-Diaz case, which claimed the Lab adhered to SWDRUG standards.

[6] "Health and human services chief says there were 'serious lapses in oversight' at state lab in drug scandal", < http://www.boston.com/metrodesk/2012/11/28/health-and-human-services-chief-says-there-were-serious-lapses-oversight-state-lab-drug-scandal/CIaIdJSWNh38hc49cNRHTL/story.html>, Nov. 29, 2012

69. One month after being terminated, Defendant Nassif filed for homestead protection on her house.[8]

                                        Respectfully submitted,
                                        Plaintiff David Jones
                                        By His Attorneys

DATED: June 10, 2015        /s/ Michael Tumposky
                                        Michael Tumposky (BBO No. 660618)
                                        Jessica D. Hedges (BBO No. 645847)
                                        Hedges & Tumposky, LLP
                                        15 Broad Street, Suite 240
                                        Boston, MA 02109
                                        T) (617) 722-8220
                                        F) (617) 507-8116
                                        E) tumposky@htlawyers.com

**CERTIFICATE OF SERVICE**

      I, Michael Tumposky, hereby certify that on this 10th day of June, 2015, I served one true and correct copy of the foregoing, where unable to do so electronically, by United States First-Class Mail, postage prepaid, to all counsel of record.

                                        /s/ Michael Tumposky
                                        Michael Tumposky

---

[7] "Two drug lab officials out in wake of chemist scandal"
<http://www.bostonglobe.com/metro/2012/09/13/top-lab-official-resigns-amid-unfolding-drug-sample-scandal/4jbHMEPoCeWMTIxX8QV73M/story.html>, September 14, 2012
[8] "Dookhan players covering their assets"
<http://commonwealthmagazine.org/uncategorized/001-dookhan-players-covering-their-assets>/, Jan. 17, 2003